ROGERS, C.J.
**509 This case chiefly concerns the scope of the ground for termination of parental rights contemplated by General Statutes § 17a-112 (j) (3) (C), regarding acts of parental commission or omission that deny a child the care necessary for the child's physical or emotional well-being.[1] The respondent parents, Morsy E. and Natasha E., appeal[2] from the judgments of the trial court terminating their parental rights as to their two daughters, Egypt E. and Mariam E., after finding that ground proven by clear and convincing evidence. The respondents claim that the court improperly terminated their parental rights as to Egypt because that child, unlike her sister, did not suffer any harm prior to her removal from the respondents' home, which they **510 contend was a necessary predicate for termination of their parental rights pursuant to § 17a-112 (j) (3) (C). The respondents claim, therefore, that the termination of their parental rights improperly was based on a finding of predictive harm, a type of harm not contemplated by § 17a-112 (j) (3) (C). We agree with the respondents that a termination of parental rights pursuant to § 17a-112 (j) (3) (C) may not be based upon predictive harm. Under the unusual procedural circumstances underlying this appeal, however, we conclude that the court properly found that *25 § 17a-112 (j) (3) (C) was proven on the basis that Egypt had been harmed by the respondents' postremoval acts of parental commission or omission. Specifically, because the petitions to terminate the respondents' parental rights were amended, and, therefore, the adjudicatory date was extended to encompass events subsequent to the filing of the original petitions, the court properly considered the conduct following the removal of the children, which had an actual, harmful effect on the well-being of Egypt. Accordingly, we affirm the judgments of the trial court.[3]
We begin by emphasizing that these cases are before this court for the second time on appeal following a retrial on the termination petitions. On June 1, 2015, the trial court, C. Taylor , J. , terminated the respondents' parental rights as to Egypt and Mariam after finding, inter alia, that the petitioner, the Commissioner of Children and Families, had proven by clear and convincing **511 evidence that the respondents' acts of parental commission or omission had denied each child the care, guidance or control necessary for her physical, educational, moral or emotional well-being. In re Egypt E. , Superior Court, judicial district of New Britain, Juvenile Matters, Child Protection Session at Middletown, Docket Nos. H14-CP-13010981A, H14-CP-13010982A, 2015 WL 4005340, *16-17 (June 1, 2015). The respondents appealed, challenging the court's findings that reasonable efforts at reunification had been made and that they had been unable or unwilling to benefit from those efforts. See In re Egypt E. , 322 Conn. 231, 241-42, 140 A.3d 210 (2016). This court reversed the judgments, reasoning that, although the trial court's additional, unchallenged finding that reunification efforts were not necessary normally would have rendered the matter moot, the trial court record did not indicate clearly that the respondents had received proper notice of that finding, thereby giving them the opportunity to challenge it on appeal. Id., at 243-44, 140 A.3d 210. We therefore remanded the case for a new trial on the termination petitions to be held no later than the fall of 2016. Id., at 244, 140 A.3d 210.
On August 5, 2016, the petitioner moved to amend the termination petitions, seeking to add a new ground for termination, namely, the respondents' failure to rehabilitate; see General Statutes § 17a-112 (j) (3) (B) ; to supplement her allegations as to reasonable efforts to reunify the respondents and the children, and to add an allegation that, on June 1, 2015, the trial court had approved a permanency plan of termination and adoption, rather than reunification, pursuant to General Statutes (Supp. 2014) § 46b-129 (k).[4] On *26 September 13, 2016, **512 the trial court denied the motion to amend insofar as it sought to add the ground of failure to rehabilitate, but granted it as to the other amendments sought by the petitioner. Accordingly, September 13, 2016, the date of the last amendment, became the adjudicatory date for the petitions.[5] See Practice Book § 35a-7 (a) (in adjudicatory phase of proceedings on petition for termination of parental rights, trial court is limited to considering evidence of events preceding latest amendment of petition); see also In re Romance M. , 229 Conn. 345, 358-59, 641 A.2d 378 (1994) ; In re Mariah S. , 61 Conn. App. 248, 254 n.4, 763 A.2d 71 (2000), cert. denied, 255 Conn. 934, 767 A.2d 104 (2001).
A second trial on the termination petitions was held before a new trial court, Hon. Barbara M. Quinn , judge trial referee, in October and November of 2016. At the conclusion of that trial, the court again terminated the respondents' parental rights on the basis of their acts of parental commission or omission. This appeal followed.
The following facts, which were found by the trial court, and procedural history are relevant to the appeal. Egypt and Mariam were born in 2012 and 2013, respectively, to Morsy and Natasha. On September 1, 2013, Morsy and Natasha brought Mariam, then about seven weeks old, to the Connecticut Children's Medical Center (hospital) on the advice of their pediatrician. That morning, according to the couple, they had noticed that **513 the infant's right shoulder was inflamed and made a " 'crunching sound' " when manipulated. Upon examination by a physician's assistant, various testing and the taking of X-rays, it was determined that Mariam had multiple bone fractures, including a "displaced fracture" of the right clavicle, two fractures of the left tibia and fractures of the left shoulder blade, left femur and right tibia. Mariam also had several bruises on various parts of her body which, according to the physician's assistant, are suspicious for child abuse when present on a child who is not independently mobile. Mariam was tested for osteogenesis imperfecta, a series of genetic bone diseases. The testing ruled out those diseases.[6]
Mariam had been in the exclusive care of Morsy and Natasha during the period in which medical professionals deemed the injuries to have occurred. Hospital staff notified the Department of Children and Families (department) and the police department in the town where the family resided about the child's injuries, and representatives of each entity arrived and questioned Morsy and Natasha. Egypt was examined for fractures or other injuries at that time, but none were found.
*27 On that same day, the petitioner placed a ninety-six hour hold on both children and removed them from the respondents' custody. On September 5, 2013, the petitioner filed petitions alleging neglect and motions for orders for temporary custody, which subsequently were granted. The children have remained in foster care with a nonrelative since that time. The petitioner filed **514 petitions to terminate the respondents' parental rights as to both children, alleging § 17a-112 (j) (3) (C) as a ground for termination, on October 4, 2013.
At the hospital, and in the days following the discovery of Mariam's injuries, Morsy and Natasha gave inadequate and shifting explanations for those injuries. They first said they knew of nothing that could have caused the injuries, then they suggested that they could have been caused by Egypt, who was then thirteen months old, when she bounced Mariam too vigorously in her "bouncy seat." Subsequently, they offered that some-thing may have happened when the children were in the care of Natasha's father and stepmother for a brief period of time ten days earlier. Neither explanation was consistent with the nature and timing of the injuries.
During questioning by the police on September 2, 3 and 5, 2013, Morsy initially stated that he had dropped Mariam onto the floor in the family's condominium. Thereafter, he explained that he had dropped her twice while he was on the stairs. Finally, as recounted in a police report, Morsy said that, during the middle of the evening before the family had arrived at the hospital, Mariam had been crying and "he picked her up under her arms. He said [that] she was facing him, and he had his fingers on her back with his thumbs anterior to her shoulders. At this time, he stated [that] he may have grabbed her too hard, and described her as crying before and after this event. In addition, Morsy ... reported [that] he placed [Mariam] hard into a bouncy chair onto the floor ... and indicated [that] he could not recall when this exactly happened. Lastly, Morsy ... described and demonstrated [that] while he was changing [Mariam's] diaper, he grabbed both [of] her legs, with his thumbs on the anterior distal thighs just above the knees [and] his fingers wrapped around her posterior lower legs, and straightened her legs by pressing down with his thumbs. He said he could not recall **515 when this specifically happened, but admitted he may have done this with more force than he was demonstrating during the interview." This explanation, unlike the others, was consistent with Mariam's injuries. Morsy was arrested on October 18, 2013, charged with various offenses, and ultimately pleaded guilty pursuant to the Alford doctrine to two counts of reckless endagement in the second degree.[7] Subsequent to admitting his culpability to the police, however, Morsy recommenced denying any knowledge of how Mariam's injuries had occurred. Natasha, for her part, also refused to acknowledge Morsy's responsibility for the injuries *28 despite his admissions and criminal conviction.
At the time of the children's removal, Morsy and Natasha were given specific steps to aid them in reunifying with their children. The specific steps directed Natasha, inter alia, to take part in parenting and individual counseling toward the goal of her being able to protect her children. As to Morsy, the specific steps directed him to take part in parenting and individual counseling toward the goals of controlling his anger, recognizing how that anger impacts his ability to care for his children and learning how to protect the children and keep them safe. The respondents chose therapists and participated in the recommended counseling, but, nevertheless, each one continued to deny that Morsy had caused Mariam's injuries.
**516 In regard to Natasha, the trial court described her progress toward the therapeutic goals as "negligible." Specifically, she "clung to all other possible explanations for [the injuries], including medical explanations, stating that unless she saw someone injuring her child, she could not know what happened. She expended considerable emotional effort to protect her own feelings for Morsy at the expense of the safety of her children." Although Natasha knew that she had not caused the injuries herself, and that Morsy was the only other adult in the couple's condominium when the injuries had occurred, her stated position, according to her counselor, was that she " 'wasn't going to accuse anybody because she didn't see anybody do it and that was pretty much her stance [for] the entire time' the counselor worked with her." Natasha took a similar position during a court-ordered psychological evaluation. At the time of the first trial, despite having heard all of the evidence, she refused to believe that Morsy played any role in causing the injuries.
Natasha divorced Morsy in June, 2014, in an effort to have her children returned to her. Nevertheless, the court found, "she had made absolutely no progress toward complying with the specific step of learning how to keep her children safe. She repeatedly, throughout the time of Morsy's incarceration, made daily telephone calls to him and professed her love for him."[8] During her court-ordered psychological evaluation, she misled the evaluator about her feelings toward Morsy and her intention to separate from him. According to the court, Natasha "pa[id] lip service to the concept of keeping her children safe," but she "has never accepted **517 the need to truly separate herself from Morsy to be able to protect [them] from future harm."
Morsy similarly participated in various types of counseling, both prior to and during his incarceration. During that counseling, however, he was unable to acknowledge his role in Mariam's injuries. He was not willing to admit responsibility for the injuries during the first termination trial, at his criminal sentencing or at a subsequent parole hearing.
On October 14, 2016, the department, in support of the amended termination petitions, alleged the following facts as establishing, in relation to Egypt, the respondents' acts of commission or omission pursuant to § 17a-112 (j) (3) (C) : that Mariam had suffered multiple fractures and bruising throughout her body, which were diagnostic for nonaccidental inflicted *29 injuries, while in the exclusive care of the respondents; that the respondents, to date, had not adequately explained and/or acknowledged responsibility for inflicting the injuries or for failing to protect Mariam; that the respondents were unwilling to separate from each other; that Natasha could not provide the care, or a plan of care, to ensure Egypt's safety and well-being; that Morsy admittedly lacked the necessary parenting skills to provide Egypt with safe discipline and structure, or to safely provide for Egypt's emotional needs; that Egypt required continual care by a competent adult who could safely provide structure, discipline and boundaries while also providing a nurturing, trusting and stable environment, and who is capable of placing Egypt's safety above his or her own needs; and that, as a result of the respondents' actions, it has been necessary to remove Egypt from an unsafe, disrupted home environment.
A six day trial was held on the petitions in October and November, 2016. The court heard the following **518 testimony: the physician's assistant, who first saw Mariam for her injuries on September 1, 2013, described those injuries, the respondents' lack of an adequate explanation for them and the results of the further testing that was ordered; a medical doctor qualified as an expert in child abuse pediatrics, who had consulted with the medical team that had treated Mariam, stated that the infant's fractures were diagnostic for inflicted injuries not caused by normal handling, described the types of blows, bending or forceful manipulation that could have produced the fractures and opined that the injuries were inflicted within the twenty-four hour period preceding the family's arrival at the hospital; two department social workers, who were assigned to the case, described the decisions to invoke a ninety-six hour hold, then to seek temporary custody of the children and eventually to pursue termination of parental rights, given the respondents' incomplete and inconsistent explanations for Mariam's injuries and their failure truly to acknowledge any responsibility for them; two police officers, who had investigated Mariam's injuries and questioned Morsy and Natasha, described Morsy's shifting stories and ultimate admissions, Natasha's lack of an explanation for the injuries and her unusual demeanor and loyalty to her husband; and Natasha's therapist, who confirmed that Natasha, although previously claiming to have separated from Morsy, had rekindled her relationship with him and had never truly acknowledged that Morsy was responsible for Mariam's injuries.
The trial court also heard testimony from two psychologists, Barbara Berkowitz, Ph.D., a clinical psychologist who had performed the court-ordered psychological evaluation of Natasha,[9] and David Mantell, Ph.D, **519 a forensic psychologist, who testified as an expert witness for the petitioner. When asked to opine on whether reunification of the children with the respondents was appropriate in light of the respondents' failure to acknowledge the cause of Mariam's injuries, which had occurred while she was in their exclusive care, and Natasha's continuing commitment to Morsy, Berkowitz testified that "if [Morsy] is continuing to maintain his innocence despite his conviction and incarceration ... and [if] there is no explanation about the injuries, it would be, not just imprudent, but unconscionable to reunify the children ... [with] the two people that are the [only] two possible perpetrators." Berkowitz *30 added that, without acknowledging and admitting the cause of the injuries, treatment of someone like Natasha would be difficult in that "the treating professional has both hands tied behind his or her back ...." As to the situation when the partner of an abuser is in denial about what occurred, Berkowitz noted that it is "not a good situation [and is] not safe for the children."
Berkowitz proceeded to agree that keeping children away from their biological parents could have adverse effects, and that, all else being equal, the first choice is always to keep families together. When the children's safety is a concern, however, the need to ensure it, unfortunately, can make removal, and the resulting harm, necessary. "[T]here's always consequences," she opined, "but [you] have to look at what's overall in the best interests of the children." When children are not raised by their biological parents, Berkowitz explained, "there are always clinical issues," such as separation and loss issues, self-esteem issues and relationship issues, but "[t]o return a child to an unchanged situation ... is to return a child to a situation where the same kinds of awful things might happen again."
Mantell agreed with Berkowitz that acknowledging the cause of the injuries inflicted upon a child was a **520 necessary starting point for any effective treatment that would prevent that harm from reoccurring. According to Mantell, generalized acknowledgments of possible involvement were insufficient for purposes of developing an abuse specific treatment plan. Mantell testified further that, to keep children safe and to prevent reoccurrence of injuries, preventive and defensive actions are necessary, and understanding how the abuse occurred is a necessary predicate to such actions.
Mantell, like Berkowitz, testified that a child's biological home generally is assumed to be the preferred child rearing location.[10] Accordingly, he opined, a child's removal from that home entails harm to his or her well-being. Specifically, a child who is removed at birth is deprived of the opportunity to experience the special conditions that exist with his or her biological parents, and a child who is removed after birth will experience a trauma, causing a psychological wound, when the bonds that child has formed with the parents are broken. Mantell agreed that, when a child's biological home is unsafe, there is a need to balance the harms of removal against ensuring the child's basic safety and that if, over time, the reasons for removal are not addressed and corrected, continuing removal is justified. He confirmed, however, that in "many" cases in which children suffer inflicted injuries in their biological homes, they ultimately are returned to the caretakers who inflicted the injuries.
**521 Morsy and Natasha testified in opposition to the petitions. They each discussed a car accident that Morsy had experienced a week before Mariam was injured, in which he had suffered a concussion and after which he was prescribed pain medications. Morsy admitted that his initial explanations for Mariam's injuries were *31 untrue and that he previously had difficulties believing that he caused the injuries, but testified that, now that he had heard all of the trial evidence, he believed that he was responsible. When shown a copy of the police report memorializing his statement that, on the night before the family arrived at the hospital, he had held Mariam forcefully by the areas of her body that were injured, he recalled grabbing her as described but could not remember applying force or causing the injuries. Morsy attributed his current realization that he had caused the injuries to hearing the testimony of the pediatrician who had consulted with Mariam's medical team and that of Mantell, which "really opened [his] eyes."
Natasha testified that, although for the prior three years she had been unsure about what had happened to Mariam, she now acknowledged that Morsy had inflicted the child's injuries. She too attributed her realization to having heard the testimony of the consulting pediatrician, although she acknowledged that previously she had seen that pediatrician's 2013 report and, further, that the potential medical causes for the injuries had been excluded much earlier. See footnote 6 of this opinion. Natasha agreed with the petitioner's counsel that the "worst thing" for her two daughters has been being separated from her, and that, due to the separation, the girls have been deprived of her parental guidance and have suffered harm to their emotional well-being.
In a memorandum of decision dated January 6, 2017, the trial court rendered judgments terminating the respondents' parental rights as to both Egypt and **522 Mariam. The court extensively discussed Natasha's inability, throughout the history of the case, to accept Morsy's role in Mariam's injuries, noting that, even at the conclusion of the retrial when she testified, her "confused beliefs were still palpably evident in her conduct and demeanor ...." The court described that Morsy "reluctantly" admitted responsibility for the injuries on the last day of the retrial and that this admission was unacceptably general and still evinced an unwillingness to face the details of what had occurred. Additionally, the court observed, neither of the respondents, at present, seemed to comprehend why removing Egypt from the home was necessary to protect her, instead "cling[ing] to the fact that Egypt was uninjured as a way to protect themselves from the awareness of the truth of Mariam's significant injuries and their failure to provide safety for both children."
The trial court found that Natasha had taken no action to inform herself about Mariam's injuries, that she could not confront the truth and that she had made "absolutely no progress" toward the goal of learning how to keep her children safe. It found further that Natasha's failure to acknowledge what had occurred meant that she could not be safely reunited with her children. The court found that Morsy similarly could not comply with the specific steps that he had been given. As the court explained, "[b]oth parents in their own individual ways demonstrate a remarkable capacity for self-deception. Even as each admitted [that] he or she now was ready to acknowledge Morsy as the source of the injuries to Mariam, each stated that awareness in very similar detached words. Such observable ... lack of candor keeps them, the court concludes, from putting the needs of their children first, admitting their faults and thereby permitting the possibility of careful reunification with their children.
**523 "This is the fatal flaw that has prevented reunification throughout these lengthy proceedings. It is at the heart of [the respondents'] inability and unwillingness to benefit from the services offered to *32 them. It means that their children, even now, could not reasonably and safely be returned to them."
Thereafter, the trial court found, by clear and convincing evidence, that the department had made reasonable efforts to reunify both respondents with their children through counseling, visitation, education and other services, but also that the respondents were unable or unwilling to benefit from those efforts. The court further noted the earlier June 1, 2015 finding that reunification efforts were not required, and that that finding had remained unchallenged. Regarding the statutory ground for the termination of the respondents' parental rights as to Egypt, the court found, by clear and convincing evidence, that § 17a-112 (j) (3) (C) had been proven, in particular, through the respondents' omissions. Specifically, both parents, because of their denials and failures to acknowledge or admit the cause of the injuries to Mariam, had made no progress toward developing a plan to keep Egypt safe. In light of their omissions, according to the court, neither parent was able to provide Egypt "the care, guidance or control necessary for [her] physical, educational, moral or emotional well-being" as contemplated by § 17a-112 (j) (3) (C).[11] (Internal quotation marks omitted.) Finally, the court made the findings mandated by § 17a-112 (k) and found further that termination of the respondents'
**524 parental rights was in the best interests of both children. This appeal followed.
The respondents claim that the trial court improperly terminated their parental rights, as to Egypt, pursuant to § 17a-112 (j) (3) (C) because there was no evidence that acts of parental commission or omission caused Egypt to suffer any type of harm prior to the department removing her from the respondents' home. Specifically, they claim, the statute's language is retrospective and contemplates harm that already has occurred to the child that is the subject of the petition, and not merely to that child's sibling, a situation that is addressed by a different statutory ground for termination not alleged in the amended petition.[12] The respondents contend that there was no indication that their home was anything other than a loving, caring and stable environment prior to Mariam being injured and both children then being removed. Accordingly, they claim, the trial court's conclusion that § 17a-112 (j) (3) (C) was satisfied, as to Egypt, improperly was predicated on a finding of prospective, predictive harm to that child. We are not persuaded. Rather, under the unusual procedural circumstances of this case, we conclude that the court properly found § 17a-112 (j) (3) (C) proven as to Egypt on the basis of the respondents' postremoval acts of parental omission, specifically, their failures to acknowledge and address the cause of Mariam's *33 injuries, which thereby required Egypt to suffer the trauma attendant to prolonged separation from her biological **525 parents' home[13] and deprived her of the care, guidance or control of her biological parents, as well as stability and permanency, for an extended three year period. Although those harmful acts of parental omission post-dated the removal of Egypt from the respondents' household, they nevertheless predated the adjudicatory date established by the amended termination petition. Accordingly, the court properly considered them and concluded that they fell within the purview of § 17a-112 (j) (3) (C).[14]
We begin with the applicable standard of review and general governing principles. Although the trial court's **526 subordinate factual findings are reviewable only for clear error, the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. In re Shane M. , 318 Conn. 569, 587-88, 122 A.3d 1247 (2015). That conclusion is drawn from both the court's factual findings and its weighing of the facts in considering whether the statutory ground has been satisfied. Id., at 587, 122 A.3d 1247. On review, we must determine "whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion].... When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.) Id., at 588, 122 A.3d 1247. To the extent we are required to construe the terms of § 17a-112 (j) (3) (C) or its applicability to the facts of this case, however, our review is plenary. *34 In re Elvin G. , 310 Conn. 485, 499, 78 A.3d 797 (2013).
"Proceedings to terminate parental rights are governed by § 17a-112.... Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the ... grounds for termination of parental rights set forth in § 17a-112 [ (j) (3) ] exists by clear and convincing evidence. The commissioner ... in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds." (Citation omitted; internal quotation marks omitted.) Id., at 500, 78 A.3d 797. Subdivision (3) of § 17a-112 (j)"carefully sets out ... [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the **527 termination of parental rights in the absence of consent.... Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Citation omitted; footnote omitted; internal quotation marks omitted.) Id., at 500-501, 78 A.3d 797.
The present case concerns § 17a-112 (j) (3) (C), which provides that a ground for termination of parental rights is established when a trial court finds, by clear and convincing evidence, that "the child [at issue] has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights ...."
To begin, we agree with the respondents that the focus of the statute clearly is retrospective, contemplating termination of rights for harmful acts of parental commission or omission that already have occurred.[15] This is apparent from the plain and unambiguous language of the provision, which requires the petitioner to show that, as a result of the parental acts of commission or omission, the "care, guidance or control" necessary for the child's well-being "has been denied ." (Emphasis added.) General Statutes § 17a-112 (j) (3) (c) ; see also In re Kelly S. , 29 Conn. App. 600, 614, 616 A.2d 1161 (1992) (General Statutes [Rev. to 1991] § 45a- **528 717 [f] [2], pertaining to termination proceeding before Probate Court when "the child has been denied" care necessary for emotional well-being, does not apply in cases of speculative harm). This is consistent, for the most part, with the other statutory grounds for removal. Specifically, unlike our statutes governing the temporary removal of a child from a parent's custody, which allow for such removal upon a showing that there is a risk of harm; see General Statutes § 17a-101g (e) ; General Statutes § 46b-129 (b) ; the statute governing termination of parental rights, a most drastic and permanent remedy, generally requires a showing, by clear and convincing evidence, that some type of physical or psychological harm to the child *35 already has occurred.[16] See General Statutes § 17a-112 (j) (3) (A) through (G).
Aside from its retrospective focus, the language of § 17a-112 (j) (3) (C) and the decisions interpreting it make clear that the types of parental behaviors and resultant harms that the statute is intended to reach are many and varied. By virtue of the language, "act or acts of parental commission or omission," both positively harmful actions of a parent and a parent's more passive failures to take action to prevent harm from occurring are encompassed by § 17a-112 (j) (3) (C). The contemplated harmful acts include, but explicitly are not limited to, "sexual molestation or exploitation, severe physical abuse or a pattern of abuse," and the resultant harm to a child's well-being may be "physical, educational, moral or emotional ...."
**529 General Statutes § 17a-112 (j) (3) (C). In sum, § 17a-112 (j) (3) (C) clearly was drafted in a manner such as would give it a broad and flexible range.
The Appellate Court decisions[17] applying § 17a-112 (j) (3) (C), or the correspondent statute for proceedings in the Probate Court, and concluding that an act of parental commission or omission had been proven demonstrate the statute's wide applicability. Recognized acts of parental commission or omission under the statute[18] have included physically assaulting a child, resulting in severe injury; In re Clark K. , 70 Conn. App. 665, 676, 799 A.2d 1099, cert. denied, 261 Conn. 925, 806 A.2d 1059 (2002) ; In re Cheyenne A. , 59 Conn. App. 151, 159, 756 A.2d 303, cert. denied, 254 Conn. 940, 761 A.2d 759 (2000) ; sexually abusing a child; In re Carissa K. , 55 Conn. App. 768, 781, 783, 740 A.2d 896 (1999) ; attempting to suffocate a child, although the child, fortunately, was not severely injured; In re Quidanny L. , 159 Conn. App. 363, 365-66, 369, 122 A.3d 1281, cert. denied, 319 Conn. 906, 122 A.3d 639 (2015) ; exposing a child to a parent's erratic, violent and mentally ill behaviors; In re Nicolina T. , 9 Conn. App. 598, 602-603, 607, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987) ; threatening and yelling obscenities at a child; In re Christine F. , 6 Conn. App. 360, 362, 505 A.2d 734, cert. denied, **530 199 Conn. 808, 809, 508 A.2d 769, 770 (1986) ; severely neglecting a child's developmental and nutritional needs; In re Juvenile Appeal (85-2) , 3 Conn. App. 184, 185-86, 193, 485 A.2d 1362 (1985) ; physically and emotionally abusing siblings or killing the child's other parent; *36 In re Sean H. , 24 Conn. App. 135, 145, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991) ; abusing a sibling in a child's presence or earshot and ordering the child to participate in such abuse; In re Payton V. , 158 Conn. App. 154, 162, 118 A.3d 166, cert. denied, 317 Conn. 924, 118 A.3d 549 (2015) ; In re Nelmarie O. , 97 Conn. App. 624, 629, 905 A.2d 706 (2006) ; refusing to believe a child's reports of sexual abuse and blaming the child for her foster care placement; In re Lauren R. , 49 Conn. App. 763, 772-73, 715 A.2d 822 (1998) ; and engaging in repeated criminal behavior resulting in prolonged incarceration, with little effort to engage in visitation with a child. In re Brian T. , 134 Conn. App. 1, 18, 38 A.3d 114 (2012). Pertinently, the statute frequently has been applied to parents who have failed to protect their children from abuse inflicted by third parties and failed to acknowledge that such abuse has occurred. See In re Jorden R. , 107 Conn. App. 12, 19, 944 A.2d 402 (2008), rev'd in part and vacated in part on other grounds, 293 Conn. 539, 979 A.2d 469 (2009) ; In re Sheena I. , 63 Conn. App. 713, 723, 778 A.2d 997 (2001) ; In re Antonio M. , 56 Conn. App. 534, 542-43, 744 A.2d 915 (2000) ; In re Tabitha T. , 51 Conn. App. 595, 603, 722 A.2d 1232 (1999) ; In re Anna B. , 50 Conn. App. 298, 307, 717 A.2d 289 (1998) ; In re Lauren R. , supra, at 772-73, 715 A.2d 822 ; In re Felicia D. , 35 Conn. App. 490, 502, 646 A.2d 862, cert. denied, 231 Conn. 931, 649 A.2d 253 (1994) ; In re Mark C. , 28 Conn. App. 247, 254-55, 610 A.2d 181, cert. denied, 223 Conn. 922, 614 A.2d 823 (1992) ; In re Christine F. , supra, at 362, 505 A.2d 734. In all of the foregoing cases, the children at issue suffered physical, emotional and/or psychological harm as a result of their parents' various acts of commission or omission. **531 In light of the foregoing, we conclude that the respondents' omissions in this case, namely, their continuing failures, over the course of three years, truly to acknowledge the cause of Mariam's injuries and to take the therapeutic steps that would prevent a similar tragedy from occurring in the future, clearly fell within the purview of § 17a-112 (j) (3) (C).[19] As we explained, the statute encompasses a broad range of parental behaviors, particularly, those that constitute a failure to protect a child by, among other things, acknowledging the existence of a dangerous situation. Moreover, contrary to the respondents' assertions, there was sufficient evidence presented to establish that these omissions were harmful to Egypt who, although physically uninjured, nevertheless suffered the emotional and psychological trauma attendant to a sudden removal from her biological parents' home, followed by years of foster placement during which she lacked the care, guidance or control of her biological parents and the stability and permanence necessary for a young child's healthy development.[20] Accordingly, *37 we will not disturb the trial **532 court's conclusion that the statutory ground for termination had been proven.[21]
The respondents argue that the testimony of Berkowitz and Mantell, who spoke of the negative effects that children suffer when they are deprived of the care and guidance of their biological parents, was insufficient to establish that Egypt had been psychologically harmed during the three years she was not in their custody. According to the respondents, the two experts spoke only in generalities and not in regard to Egypt specifically. We disagree because, "in [a] termination proceeding, [p]sychological testimony from professionals is rightly accorded great weight"; (internal quotation marks omitted)
**533 In re Elijah C. , 326 Conn. 480, 501, 165 A.3d 1149 (2017) ; see also In re Shane M. , supra, 318 Conn. at 590, 122 A.3d 1247 (same); and the respondents have provided no reason for us to conclude that Egypt would be exempt from experiencing the traumas that, as the psychological experts explained, generally befall children in Egypt's circumstances. Again, Berkowitz testified that "[t]here's always consequences" when children are removed from their parents' custody, and "there are always clinical issues" when children are not raised by their biological parents. (Emphasis added.) Mantell explained that removing a child from her biological home entails harm to her well-being, and that, when a child who is old enough to have bonded with her parents, as Egypt was, is then removed from her home, the resultant trauma will cause a psychological wound.
Additionally, the record in this case does include evidence that Egypt, in particular, was harmed by the extended period of separation during which she was deprived *38 of her biological parents' care, guidance or control. Specifically, Natasha responded affirmatively that the "worst thing" for her daughters was to be separated from her, and she agreed that, due to that separation, they had been deprived of her parental guidance and suffered harm to their emotional well-being.[22] Moreover, information in the reports memorializing Berkowitz' psychological evaluations of Natasha, the children and the children's maternal grandmother is indicative of Egypt's emotional suffering. Those reports were part **534 of the evidence before the trial court.[23] In light of the foregoing, we reject the respondents' contention that there was insufficient evidence of harm to Egypt's well-being.
As a final matter, the respondents contend that the trial court, relying on Mariam's serious physical injuries, improperly placed on them the burden of showing that their parental rights, as to Egypt, should not be terminated. Section 17a-112 (j) (3) (C) provides, in its terminal **535 clause, that serious physical injury to a child shall constitute "prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights," effectively rendering additional proof of such parental acts or omissions unnecessary. The Appellate Court has described this statutory language as *39 "shift[ing] the burden from the petitioner to the [respondent] to show why a child with clear evidence of physical injury that is unexplained should not be permanently removed from [the respondent's] care." In re Sean H. , supra, 24 Conn. App. at 144, 586 A.2d 1171. The trial court here quoted the Appellate Court in the portion of its opinion finding that § 17a-112 (j) (3) (C) was proven as to Mariam, who clearly had suffered serious physical injuries. Thereafter, in the separate section of its opinion analyzing whether § 17a-112 (j) (3) (C) had been proven as to Egypt, who suffered no such injuries, the court briefly referred again to a burden shift.
After examining the broader context of the trial court's reference, we disagree with the respondents that the court considered Mariam's physical injuries to constitute prima facie evidence of the respondents' acts of parental commission or omission as to Egypt. Moreover, we conclude that the court held the petitioner to the requisite standard of proof. Specifically, in the immediately preceding paragraphs of the opinion, the court first quoted § 17a-112 (j) (3) (C), but placed emphasis on portions of the statute other than its terminal clause. It then discussed the respondents' behaviors solely in the period of time subsequent to Mariam's injuries and concluded that it was "their failure to act, their omissions, which for each of them establishes by clear and convincing evidence this specific ground for termination of parental rights. [Particularly] [i]n Natasha's case, it is her failure to come to terms with what has happened to her youngest daughter and her former husband's culpability [for] those injuries. For Morsy, it **536 is his failure to even now admit fully what he did." (Emphasis added.) Because the court's decision, considered as a whole, discloses no improper allocation of the burden of proof or reliance on Mariam's injuries to find that § 17a-112 (j) (3) (C) was proven as to Egypt, we conclude that there is no merit to the respondents' claim.
The judgments are affirmed.
In this opinion PALMER, EVELEIGH, ROBINSON and ESPINOSA, Js., concurred.

General Statutes § 17a-112 (j) (3) (C) provides that a trial court may terminate parental rights if "the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights ...." To terminate parental rights, the court also must find that reasonable efforts have been made to reunify a parent and child, unless the parent is unable or unwilling to benefit from those efforts or the court finds that such efforts are unnecessary; General Statutes § 17a-112 (j) (1) ; and that termination of parental rights is in the best interest of the child. General Statutes § 17a-112 (j) (2).
Since the filing of the termination of parental rights petitions in the present cases, § 17a-112 was the subject of certain amendments that have no bearing on the merits of this appeal. E.g., Public Acts 2016, No. 16-105, §§ 1 and 2. For purposes of clarity, we refer to the current revision of the statute.

The respondents appealed from the judgments of the trial court to the Appellate Court. Thereafter, we granted the respondents' motions, pursuant to Practice Book § 65-2, to transfer the appeals to this court.

The respondents also claim that, because the termination of their parental rights as to Egypt was improper, the judgment terminating their parental rights as to Mariam should be reversed. In light of our conclusion that the trial court properly terminated the respondents' parental rights as to Egypt, we need not consider this claim. Furthermore, Natasha's claim that there was insufficient evidence that reasonable efforts were made to reunify her with both children and that she was unable to benefit from those efforts is moot because she failed to challenge the trial court's approval of the permanency plan of termination and adoption. See footnote 14 of this opinion.

Pursuant to General Statutes § 17a-111b (a) (2), "[t]he Commissioner of Children and Families shall make reasonable efforts to reunify a parent with a child unless the court ... has approved a permanency plan other than reunification pursuant to subsection (k) of section 46b-129."
Pursuant to General Statutes § 17a-112 (j) (1), before a trial court may grant a petition for termination of parental rights, it must make a finding that reasonable efforts have been made to reunify the parent and the child, "unless the court finds in [the termination] proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required ...."

At the beginning of the new trial, counsel for the petitioner sought confirmation of the adjudicatory date for the petitions, observing that, pursuant to the rules of practice, it would be September 13, 2016. When the trial court asked if any other party would like to be heard on that matter, Morsy's counsel and counsel for the children explicitly agreed, while Natasha's counsel did not object.

Thereafter, Natasha sought a second opinion on whether Mariam suffered from a bone disease. Tests were again performed the following month and produced the same results. A report memorializing the results of the testing was in evidence, and it indicates that the normal test results were discussed with Natasha. The parties further stipulated that the doctor who had performed these tests testified at the first trial on the termination petitions and that both respondents were present and had heard her testimony.

Morsy initially was charged was assault in the first degree in violation of General Statutes § 53a-59, reckless endangerment in the first degree in violation of General Statutes § 53a-63 and risk of injury to a child in violation of General Statutes § 53-21. On August 27, 2015, he pleaded guilty pursuant to the Alford doctrine; see North Carolina v. Alford , 400 U.S. 25, 37, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (allowing defendant to enter guilty plea without admitting guilt based on acknowledgement that state has strong evidence to support conviction); to two counts of reckless endangerment in the second degree in violation of General Statutes § 53a-64 and two counts of interfering with an officer in violation of General Statutes § 53a-167a. He was later sentenced, with a maximum release date of June 4, 2018.

In evidence were telephone logs and computer disks memorializing more than 700 telephone conversations between Morsy and Natasha during his period of incarceration, which, at the time of trial, he was yet to complete. During those telephone conversations, the two professed their love for each other and their desire to reunite the family upon his release from prison.

Berkowitz also evaluated the children and their maternal grandmother, with whom Natasha resided at the time, but did not evaluate Morsy. Morsy, for unexplained reasons, had refused to participate in the evaluation sessions.

Mantell explained his reasoning: "The assumptions are that there's a biological kinship that will promote mutual identification between the adult and the child, that with that biological identification comes as accompaniments emotional [and] psychological identifications that provide a child with a sense of identity and security, that children under those circumstances, it is assumed, are more likely to be valued, nurtured, protected and [will] develop more normally." In Mantell's view, a child who remains in his or her biological home is "likely to have a better life than [one] who grow[s] up in other circumstances."

As to Mariam, the court found § 17a-112 (j) (3) (C) satisfied in that there was clear and convincing evidence that she had suffered nonaccidental, serious physical injuries while in the care of the respondents, which were not explained or acknowledged by them until the last day of trial, and that the respondents had failed to show that Mariam could be returned safely to their care. Neither of the respondents has challenged these findings on appeal.

See General Statutes § 17a-112 (j) (3) (F) (permitting termination of parental rights when parent deliberately has killed, or caused serious bodily injury to, another child of the parent). Although the petitioner alleged this ground for the termination of Morsy's parental rights as to Egypt in the first trial, the trial court found it unproven. See In re Egypt E. , supra, 2015 WL 4005340, at *17-18. Thereafter, in the retrial, the petitioner withdrew the allegations as to § 17a-112 (j) (3) (F) and proceeded on § 17a-112 (j) (3) (C) alone.

On appeal, the respondents have not challenged the finding of neglect as to Egypt, which resulted in the department being granted custody of the child for the duration of these proceedings. Accordingly, we need not determine whether the initial separation of Egypt from the respondents beyond the preliminary ninety-six hour hold period was proper. We emphasize, however, that the initial removal of Egypt from the respondents' home does not form the basis of our conclusion that the respondents' acts of omission harmed Egypt's physical or emotional well-being.

Natasha claims additionally that the trial court improperly terminated her parental rights, as to both children, because there was insufficient evidence that reasonable efforts were made to reunify her with the children and that she was unable or unwilling to benefit from those efforts. See General Statutes § 17a-112 (j) (1). This claim necessarily fails because, as the amended petitions and the court's memorandum of decision make clear, a permanency plan of termination and adoption, rather than reunification, previously had been approved by the court, thereby making reasonable efforts to reunify unnecessary. See footnote 4 of this opinion; see also General Statutes § 17a-111b (a) (2). Because the finding that reasonable efforts were unnecessary remains unchallenged, any claim that such efforts were insufficient or that Natasha could not benefit from those efforts is moot. See In re Egypt E. , supra, 322 Conn. at 243, 140 A.3d 210 ; see also In re Jorden R. , 293 Conn. 539, 557, 979 A.2d 469 (2009).
Both respondents further argue that, in the event this court reverses the judgment of termination of parental rights as to Egypt on the basis of the claims made herein, we also should reverse the judgment as to Mariam and remand the case for a redetermination of whether termination of their parental rights remains in Mariam's best interests. In the respondents' view, such relief is warranted because of the strong sibling bond between the two children, which the trial court recognized. Because, as we explain herein, we disagree that the trial court improperly terminated the respondents' parental rights as to Egypt, we need not consider their claim that a reversal of the judgment as to her also should require a reversal of the judgment as to Mariam.

In fact, the petitioner does not contest that the statute requires actual, rather than speculative or predictive harm, but argues that actual harm to Egypt was proven. As explained hereinafter, we agree with the petitioner.

We agree with the respondents that there is no evidence that, in October, 2013, when the petitioner initially sought to terminate their parental rights, Egypt, as opposed to Mariam, had suffered any harm to her physical, educational, moral or emotional well-being as a result of the respondents' acts of parental commission or omission. Had we reviewed this claim in the appeal from the first termination trial, therefore, in which the operative petitions, and hence the adjudicatory dates, were contemporaneous with the removal of the children, the result, as to Egypt, likely would not have been affirmed.

This court has not had much occasion to interpret § 17a-112 (j) (3) (C) or the corresponding Probate Court statutes. In one case, we held, as a matter statutory construction, that the legislature did not intend for the statute to apply to parental acts of commission or omission predating a child's birth. See In re Valerie D. , 223 Conn. 492, 512-13, 613 A.2d 748 (1992). In another, we held that a parent's life-threatening attacks on her children, caused by a psychotic episode, provided overwhelming evidence of acts of parental commission or omission adversely affecting the children's physical, emotional and psychological well-being. See In re Theresa S. , 196 Conn. 18, 26-27, 491 A.2d 355 (1985).

We note that, although some of the listed behaviors, standing alone, satisfied § 17a-112 (j) (3) (C), most were considered to do so in combination with other parental acts or omissions.

As to the respondents' claim that such acts properly are characterized as a failure to rehabilitate; see General Statutes § 17a-112 (j) (3) (B) ; we do not disagree but observe, nevertheless, that our jurisprudence is replete with cases in which particular parental behaviors have been held to satisfy more than one statutory ground for termination. See, e.g., In re Kezia M. , 33 Conn. App. 12, 16, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

We note in this regard that the harm caused to Egypt, upon which we rely to find that § 17a-112 (j) (3) (C) was satisfied, is not merely that caused by her removal from the home, as such would render this statutory ground for termination proven in most any child protection case. Rather, it is the harm caused by the respondents' continuing, longstanding refusal to acknowledge any responsibility for the circumstances necessitating that removal and their prolonged failure to make any progress toward remedying those circumstances.
As earlier noted, Mantell testified that in "many" cases in which children suffer inflicted injuries in their biological homes they ultimately are returned to the caretakers who inflicted the injuries. A department social worker testified similarly, but additionally provided that in those situations there is acknowledgement and remedying of the situation that led to the assault. Cf. In re Anna B. , supra, 50 Conn. App. at 301-302, 717 A.2d 289 (department declined to return children who were sexually assaulted to their home, although it had been willing to consider such return, because mother failed to remove perpetrator as requested). In short, the prolonged separation of Egypt from the respondents was not inevitable, but, rather, was a result of the respondents' continuing omissions as described herein.

The court's memorandum of decision, in finding § 17a-112 (j) (3) (C) proven, does not contain explicit findings as to the harm suffered by Egypt as a result of the respondents' acts of parental omission, but, rather, consistent with the statutory language, is more focused on those acts of omission themselves. Earlier in the proceedings, at the conclusion of the petitioner's case, the respondents had filed a joint motion for a directed judgment, requesting that the court dismiss the petition for the termination of their parental rights as to Egypt. They contended that a termination of rights premised on § 17a-112 (j) (3) (C) required, as a matter of law, that some type of harm already had befallen the child who was the subject of the petition and, here, there was no evidence that Egypt had suffered any such harm. In opposing the motion, the petitioner argued that moral or emotional harm could suffice and cited, inter alia, the testimony of Berkowitz and Mantell.
On November 7, 2016, the trial court, ruling from the bench, summarily denied the respondents' motion, "find[ing] that there [was] adequate evidence in the record ... to find that the [petitioner] has made out a prima facie case for ... [the] claims." The respondents did not request further clarification of the ruling, nor did they seek an articulation. Accordingly, we have reviewed the entire record to determine whether the ruling had a proper evidentiary basis. Notably, the evidence that we discuss herein was not contested by the respondents, and it was, to some degree, supplied by Natasha herself.

We acknowledge that Natasha provided this testimony to establish that it was not in her daughters' best interests for her parental rights to be terminated. The testimony is also evidence, however, that Natasha was aware that separation was detrimental to her daughters. Nonetheless, she persisted in a course of conduct that prevented reunification by refusing to engage meaningfully in steps to create a safe home environment to which the children could return. Specifically, she failed to acknowledge the role that Morsy played in Mariam's injuries and her own responsibility for ensuring a safe environment for children.

Natasha and the maternal grandmother saw the children during visitation sessions and spoke to Berkowitz about their impressions. As to the maternal grandmother, Berkowitz' report indicates that she was "worried that Egypt was emotionally suffering by being away from her parents." The grandmother informed Berkowitz that Egypt "was particularly close to her father, [who at the time of the evaluation] she no longer sees at all," that Egypt frequently asked for her father during visitation sessions, and that Egypt was " 'losing her spark' due to the separation from her parents."
Natasha, for her part, expressed to Berkowitz her belief that reunification was in her children's best psychological interests because " 'they love me. I'm their mommy; no one in the world will take care of them as well as I do, or love them as much.' " She stated that her strongest concern, at the time, was the mental well-being of the children. Although Natasha believed that the children, physically, were alright, she "believed she could see 'trauma emotionally with Egypt. She asks for her father at every visit. She is very attached to him.' " Natasha also opined that Egypt was unhappy and needed an outlet, such as art therapy, to express herself.
In reporting on an interaction session between the children and Natasha that she had observed, Berkowitz indicated that Egypt seemed more distressed than Mariam and noted parenthetically that "Egypt was used to being raised by her mother, and is developmentally old enough to experience more distress from the separation." Berkowitz noted further that Egypt was asking for her father, whom she called " 'Baba,' " during the interaction session, "seeming to reflect the close father-daughter bond [that Natasha and her mother] had reported."
Egypt's total separation from her father was due, at some point, to Morsy's incarceration, but ultimately it was his failure to take responsibility for causing Mariam's injuries that limited the efficacy of the services available to him while incarcerated, influenced the denial of his parole, and thereby prevented reunification with Egypt. See In re Katia M. , 124 Conn. App. 650, 666, 670, 6 A.3d 86, cert. denied, 299 Conn. 920, 10 A.3d 1051 (2010) (although incarceration alone may not form basis for termination of parental rights and it limits services that department can provide incarcerated parent, it does not excuse parent's failure to use resources offered).