******************************************************************

   The ''officially released'' date that appears near the
beginning of this opinion is the date the opinion was
released as a slip opinion. The operative date for the
beginning of all time periods for filing postopinion
motions and petitions for certification is the ''officially
released'' date appearing in the opinion.

   This opinion is subject to revisions and editorial
changes, not of a substantive nature, and corrections
of a technical nature prior to publication in the
Connecticut Law Journal.

******************************************************************

IN RE ANNESSA J.*
(AC 44405)
(AC 44497)

Bright, C. J., and Alexander and Norcott, Js.

*Syllabus*

The respondent parents filed separate appeals to this court from the judg-
ment of the trial court terminating their parental rights with respect to
their minor child, A, and denying their motions for posttermination
visitation with A. *Held*:

1. The respondent mother could not prevail on her unpreserved claims that
the trial court violated her state and federal constitutional rights during
the termination proceedings.

a. The respondent mother could not prevail on her claims that that the
trial court violated her rights under article fifth, § 1, and article first,
§ 10, of the Connecticut constitution by conducting the proceedings to
terminate her parental rights over the Microsoft Teams platform, a
collaborative computer meeting program, and her right to due process
of law by denying her motion for permission to allow her expert witness
to review certain information and conduct an independent evaluation,
her claims being unpreserved and evidentiary, not of constitutional
magnitude: she failed to establish that there exists a fundamental right
under our state constitution to an in person, in court termination of
parental rights trial; moreover, the court did not deny her the use of an
expert but merely denied her late motion for release of confidential
records and for permission to conduct an independent evaluation on
the eve of trial; accordingly, the claims were not reviewable under the
second prong of *State* v. *Golding* (213 Conn. 233).

b. The respondent mother could not prevail on her unpreserved claim
that the trial court violated her right to due process of law under the
fourteenth amendment to the United States constitution by precluding
her from confronting witnesses in person by conducting the termination
of parental rights proceedings over the Microsoft Teams platform;
although the mother requested an in person, in court trial, she did not
argue on appeal that she had an absolute right to an in person, in court
trial where she could physically confront witnesses, even if there was
evidence of a need for a remote trial, rather, she contended that there
was no evidence as to the need for a remote trial, and, because she did
not ask the court to hold an evidentiary hearing on the need for such
a trial, the record was not adequate to review the claim, and the claim
failed under the first prong of *Golding*.

2. The trial court did not err in terminating the respondent father's parental
rights with respect to A.

a. This court declined to review the respondent father's claim that the
trial court erred in concluding that the Department of Children and
Families made reasonable efforts to reunite him with A as that claim
was moot; the court also found that he was unable or unwilling to
benefit from reunification efforts and, as the father failed to challenge
that independent basis for the court's finding that the department made
reasonable efforts to reunite him with A, this court could not afford
him any practical relief.

b. The trial court's finding that the respondent father had failed to
achieve a sufficient degree of personal rehabilitation as would encourage
the belief that within a reasonable period of time, considering the age
and needs of A, he could assume a responsible position in her life, as
required by statute (§ 17a-112 (j) (3) (B) (i)), was supported by clear
and convincing evidence in the record; although the father had made
some progress in his rehabilitation, there was evidence showing that
he was reluctant to cooperate with the department and that he had
taken more than two years to begin addressing his problematic sexual
behavior toward A, which was still a problem, thus, the record supported
the conclusion that the father could not assume a role as a safe and
responsible parent for A within a reasonable period of time.

c. The trial court's determination that the termination of the respondent

father's parental rights was in the best interest of A was not clearly erroneous, as it was supported by the court's findings and conclusions with respect to the seven applicable statutory (§ 17a-112 (k)) factors, as well as the court's conclusion regarding A's need for permanency and stability; although A expressed a desire to stay in contact with her father, she also wanted to remain in the care of her foster mother, with whom she had been living for more than two years, and the father had failed to address the problem sexual behavior that was a significant factor in A's removal and had failed to make sufficient efforts to adjust his circumstances, conduct and conditions such that he could assume the role of the caregiver.

3. The trial court erred in denying the motions of the respondent mother and the respondent father for posttermination visitation with A, the court having failed to consider the appropriate standard under the applicable statute (§ 46b-121 (b) (1)) and our Supreme Court's holding in *In re Ava W.* (336 Conn. 545): in deciding the motions, the court was required to take a broad view of the best interest of A, including considering the factors set forth in *In re Ava W.*, such as the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and the birth parent prior to termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, and any impact on adoption prospects for the child, to determine whether posttermination visitation was necessary or appropriate to secure the welfare, protection, proper care and suitable support of A; accordingly, the case was remanded for further proceedings on the respondents' posttermination motions for visitation.

Argued May 17—officially released August 3, 2021**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of Hartford, Juvenile Matters, and tried to the court, *Olear, J.*; judgment terminating the respondents' parental rights; thereafter, the court denied the respondents' motions for posttermination visitation, and the respondents filed separate appeals to this court. *Affirmed in part; reversed in part; further proceedings.*

*Albert J. Oneto IV*, assigned counsel, for the appellant in Docket No. AC 44405 (respondent mother).

*Sara Nadim*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare E. Kindall*, solicitor general, and *Evan O'Roark*, assistant attorney general, for the appellee in Docket No. AC 44405 (petitioner).

*Joshua Michtom*, assistant public defender, for the appellant in Docket No. AC 44497 (respondent father).

*Sara Nadim*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Evan O'Roark*, assistant attorney general, for the appellee in Docket No. 44497 (petitioner).

*Opinion*

BRIGHT, C. J. In Docket No. AC 44405, the respondent mother (mother) appeals from the judgment of the trial court terminating her parental rights to, and denying her motion for posttermination visitation with, her minor child, Annessa J. On appeal, the mother claims that the trial court (1) violated her right to a "public civil trial at common law" by conducting proceedings over the Microsoft Teams platform,[1] rather than in court and in person, in violation of article fifth, § 1, and article first, § 10, of the Connecticut constitution, (2) violated her right to due process of law by precluding her from confronting witnesses in court and in person when it conducted proceedings over the Microsoft Teams platform, and (3) violated her right to due process of law when it denied her motion for permission to allow her expert witness to review certain information. We are not persuaded.

In Docket No. AC 44497, the respondent father (father) appeals from the judgment of the trial court terminating his parental rights to, and denying his motion for posttermination visitation with, his minor child, Annessa. On appeal, the father claims that the trial court improperly concluded that (1) the Department of Children and Families (department) had made reasonable efforts to reunify him with his daughter, (2) there was sufficient evidence to conclude that he was unable or unwilling to rehabilitate, and (3) termination of his parental rights was in the best interest of Annessa. We are not persuaded.

In addition, in Docket Nos. AC 44405 and AC 44497, the mother and the father, respectively, claim that the trial court applied an incorrect legal standard when it considered their posttermination motions for visitation with Annessa. We are persuaded that the court employed an improper standard, and, accordingly, we reverse the judgment of the trial court as to the denial of the posttermination motions for visitation, and we remand the case to the trial court for further proceedings on those motions.

The following facts, as found by the trial court by clear and convincing evidence, and procedural history inform our review of both appeals.

On February 10, 2001, due to physical abuse at the hands of her mother, the mother was committed to the care and custody of the petitioner, the Commissioner of Children and Families, where she remained until reaching the age of eighteen. The mother also elected to receive additional voluntary services from the department until she reached the age of twenty-three. She has become a licensed professional nurse.

At the time of the trial in this matter, the mother and the father had been married for six to seven years but had been in a relationship for approximately twelve

years. Their only child, Annessa, was born in 2006. In 2009, the department became involved with the mother and the father because they had failed to provide adequate supervision and care for Annessa. The department also had concerns about intimate partner violence. Annessa subsequently was committed to the care and custody of the petitioner, and the court ordered specific steps for the mother and the father. The mother and the father completed a parenting program through the Village for Families and Children, although the mother failed to comply with many of the specific steps that had been ordered. In July, 2010, Annessa was reunified with the father under protective supervision, which expired in December, 2010. By approximately December, 2010, the mother and the father had reunited and begun to cohabitate again; intimate partner violence also resumed.

"On November 17, 2017, the department's Careline received a report alleging sexual abuse by the father of Annessa and physical neglect of Annessa by the mother. The mother had reported that sometime in late fall/early winter of 2016, or as late as March, 2017, the father [had] disclosed to her that Annessa's foot touched his penis and he woke up with an erection. This matter was never addressed further by the mother or the father. Then, sometime in July, 2017, the father admitted to the mother that he had touched Annessa's genitals over her underpants in order to teach her a lesson. According to the mother, she asked the father to leave the house in August, 2017. The father has reported that he was not asked to leave until October, 2017. After the department was alerted to the incident, efforts were made to connect with the mother and specifically to have her place Annessa in therapy. The mother [however] would not commit to doing so."

On December 8, 2017, after the father left the home, he was arrested after he kicked in the door to the mother's apartment. Shortly thereafter, the first of four protective orders was issued against him in favor of the mother. The father pleaded guilty to numerous charges as a result of his December 8, 2017 arrest, and he received a sentence of one year of incarceration, execution suspended, with two years of probation.[2]

Annessa later reported that the mother would leave her alone for days at a time, that she would not know the whereabouts of the mother at those times, and that the apartment would have no heat or electricity. On December 4, 2017, during a forensic interview at Klingberg Children's Advocacy Center, Annessa reported that the father had touched her "bikini area" over her underwear.

"On January 16, 2018, the [petitioner] filed a petition of neglect. On April 5, 2018, the [petitioner] invoked a [ninety-six] hour administrative hold on [Annessa]. On April 9, 2018, the [petitioner] filed an ex parte motion

for an order of temporary custody (OTC). The court issued the OTC on the same date, and it was sustained on May 7, 2018. On July 31, 2018, [Annessa] was adjudicated neglected and committed to the custody of the [petitioner] until further order of the court. She has remained committed to date." Annessa was placed in foster care with the woman who had been the foster mother to the mother. The mother and Annessa also had lived on the second floor of the foster mother's apartment house until shortly before Annessa was removed from the mother's care and custody. Annessa is bonded to the foster mother and has been clear in her desire to remain in the custody of the foster mother. Academically, she is excelling.

The mother and the father were given specific steps to facilitate reunification with Annessa, including addressing mental health issues, parenting deficiencies, and intimate partner violence; the father also was ordered to address the sexual abuse of his daughter. The mother neither kept appointments set by the department nor cooperated with the department. The father missed several administrative case review appointments, but he participated in counseling and made some progress. However, he falsely reported to the department that he had discussed with his therapist the sexual abuse of his daughter.

"On March 28, 2019, and February 6, 2020, the court approved a permanency plan of termination of parental rights and adoption. The trial on the [termination of parental rights] petition was conducted on September 2, 3, and 17, and October 6, 2020. The mother and the father appeared and were zealously represented by counsel."[3]

In its October 23, 2020 memorandum of decision, the court found, in accordance with General Statutes §17a-112 (j) (1), that the department had made reasonable efforts to locate and identify the mother and the father, that the department had made reasonable efforts to reunify each of them with Annessa, and that neither the mother nor the father was able or willing to benefit from reunification efforts. The court also determined that such efforts at reunification no longer were appropriate. Additionally, in accordance with § 17a-112 (j) (3) (B), the court found that the petitioner had proven by clear and convincing evidence the "failure to rehabilitate" ground for termination of the respondents' parental rights. Next, in accordance with § 17a-112 (k),[4] the court considered each of the seven statutory factors and concluded that termination of the parental rights of both the mother and the father was in the best interest of Annessa.

In its memorandum of decision, the court also considered the motions for posttermination visitation that the mother and the father each had filed, finding that "neither the mother nor the father have met their burden

to prove posttermination visitation for such parent is necessary or appropriate to secure the welfare, protection, proper care and suitable support of [Annessa]." The court further concluded that the best interest of the child is not the proper standard for resolving motions for posttermination visitation. Finally, although noting that the father and Annessa have a good visiting relationship, the court found that posttermination visitation with the mother or the father was not *required* for Annessa's "well-being, welfare, protection, proper care or suitable support." Accordingly, the court denied each party's motion. These appeals followed.[5] Additional facts and procedural history will be set forth as appropriate.

We begin by setting forth the general legal principles relevant to the respondents' claims. "Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase." (Internal quotation marks omitted.) *In re November H.*, 202 Conn. App. 106, 116, 243 A.3d 839 (2020). Section 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .''

Additionally, our Supreme Court has determined that "the trial court . . . [has] the authority to grant posttermination visitation" when, during the proceedings to terminate parental rights, a respondent files a motion requesting such visitation. *In re Ava W.*, 336 Conn. 545, 577, 590 n.18, 248 A.3d 675 (2020). "[T]he standard for evaluating posttermination visitation [derives] from the authority granted to [the trial court] under [General Statutes] § 46b-121 (b) (1)[6]—'the Superior Court shall have authority to make and enforce such orders . . .

necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child . . . .' Even though . . . courts have broad authority in juvenile matters, that broad authority has been codified in § 46b-121 (b) (1), which defines the contours of the courts' authority to issue orders 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child . . . .' General Statutes § 46b-121 (b) (1). . . . [W]hen evaluating whether posttermination visitation should be ordered . . . [the court should] adhere to the standard that the legislature expressly adopted—'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . .' General Statutes § 46b-121 (b) (1) . . . .

"Whether [it is appropriate] to order posttermination visitation is, of course, a question of fact for the trial court, 'which has the parties before it and is in the best position to analyze all of the factors [that] go into the ultimate conclusion that [posttermination visitation is in the best interest of the child].' . . . Our dedicated trial court judges, who adjudicate juvenile matters on a daily basis and must make decisions that concern children's welfare, protection, care and support, are best equipped to determine the factors worthy of consideration in making this finding. As examples—which are neither exclusive nor all-inclusive—a trial court may want to consider the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference with present custodial arrangements, and any impact on the adoption prospects for the child. . . . [The trial court] should, of course, evaluate those considerations independently from the termination of parental rights considerations."[7] (Citations omitted; footnote added.) *In re Ava W.*, supra, 336 Conn. 588–90. We now consider separately the appeals from the judgment terminating parental rights in AC 44405 and in AC 44497, followed by our consideration of the court's denial of the motions for posttermination visitation.

I

AC 44405

The mother claims that the trial court (1) violated her right to a "public civil trial at common law" by conducting proceedings over the Microsoft Teams platform, rather than in court and in person, in violation of article fifth, § 1, and article first, § 10, of the Connecticut constitution, (2) violated her right to due process of law by precluding her from confronting witnesses in court and in person when it conducted proceedings over the Microsoft Teams platform, and (3) violated her right to due process of law when it denied her

motion for permission to allow her expert witness to review certain information.[8] We will consider each claim in turn.

## A

The mother first claims that the court violated article fifth, § 1, and article first, § 10, of the Connecticut constitution[9] by conducting proceedings over the Microsoft Teams platform, rather than in court and in person. She argues that "[a]rticle [f]ifth, § 1, creates a duty on the part of the Superior Court to find facts by observing firsthand the parties and witnesses in physical proximity to each other [and] [a]rticle [f]irst, § [10], creates a right of the citizenry to a public civil trial of the kind that existed at common law in 1818." The mother concedes that she did not raise a constitutional claim before the trial court, although she did object to holding the hearing via Microsoft Teams, and, therefore, she requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[10] The petitioner argues that the mother's claim is not reviewable because the claim fails the second prong of *Golding* and that, even if the claim can be viewed as constitutional, it also fails under the third and fourth *Golding* prongs. We conclude that the mother has failed to establish that there exists a fundamental right under article fifth, § 1, or article fifth, §10, of our state constitution to an in court, in person trial, as opposed to a trial conducted over a virtual platform such as Microsoft Teams, during a termination of parental rights proceeding.[11] See *State* v. *Fuller*, 178 Conn. App. 575, 582, 177 A.3d 578 (2017) (procedural right does not "give rise in and of itself to a constitutional right" (internal quotation marks omitted)), cert. denied, 327 Conn. 1001, 176 A.3d 1194 (2018). Accordingly, her claim is not reviewable because it fails under *Golding*'s second prong. See footnote 10 of this opinion.

"With respect to the second prong of *Golding*, [t]he [respondent] . . . bears the responsibility of demonstrating that [her] claim is indeed a violation of a fundamental constitutional right. Patently nonconstitutional claims that are unpreserved at trial do not warrant special consideration simply because they bear a constitutional label." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 106 Conn. App. 238, 257, 941 A.2d 989, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008).

In the present case, the mother contends that, at common law, there was a right to an in person, in court public trial in all civil cases. She argues that this right was codified in our state constitution. Although the mother agreed during oral argument before this court that a public trial is not constitutionally required in juvenile matters, she, nevertheless, contends that our state constitution requires that termination of parental rights proceedings be conducted in a physical court-

room with both the judge and the parents physically present. She contends that this is constitutionally required under our state constitution because the credibility and fact-finding determinations of the judge could be impacted by the judge's ability or inability to see the whole courtroom and the litigants in person.[12]

After reviewing the mother's arguments and considering the provisions of article fifth, § 1, and article first, § 10, and the common law she cites, we are not persuaded that she has established that there exists a fundamental right under our state constitution to an in person, in court termination of parental rights trial.

B

The mother next claims that the trial court violated her right to due process of law under the fourteenth amendment to the United States constitution by precluding her from confronting witnesses in court and in person when it conducted proceedings virtually over the Microsoft Teams platform. She argues that, "[a]lthough the trial court referenced the COVID-19 public emergency as the reason for conducting the trial virtually, there was no actual evidence before the court that the COVID-19 virus threatened the health or safety of any of the persons involved in this particular case. Under such circumstances, the risk of an erroneous deprivation of parental rights created by virtual fact-finding outweighed the court's concern for the health and safety of the participants in this matter under the applicable due process balancing test." Because this claim is unpreserved, the mother requests review under *State* v. *Golding*, supra, 213 Conn. 239–40. See footnote 10 of this opinion.

The petitioner argues that this claim is not reviewable for two reasons: first, because there is no evidentiary record regarding the health and safety procedures necessary for the participants in the proceedings and, second, because the mother has only a statutory right to confront witnesses in a termination of parental rights proceeding, not a constitutional right. The petitioner also argues, "[t]o the extent that [the mother] claims she has a general procedural due process right to confront and cross-examine witnesses in-person, it is subject to an analysis pursuant to *Mathews* v. *Eldridge*, 424 U.S. 319, [96 S. Ct. 893, 47 L. Ed. 2d 18] (1976) . . . [and] [s]he is unable to meet her burden [under that analysis]." We agree with the petitioner that the record is inadequate to review this unpreserved claim.

Although the mother requested an in person, in court trial, she did not ask the court to hold an evidentiary hearing on the need for a remote trial. It is important to note that the mother *does not argue* on appeal that she had the absolute right to an in person, in court trial where she could physically confront witnesses, even if there was evidence of the need for a remote trial.

Rather, she contends that she had such a right *because* there was no evidence as to the need for a remote hearing. Accordingly, we agree with the petitioner that the record is not adequate to review the claim made on appeal, and, accordingly, this claim fails under *Golding*'s first prong.

C

The mother next claims that the trial court violated her right to the due process of law when it denied her motion for permission to allow her expert witness to review certain information. Specifically, she argues that "she was without the adequate assistance of an expert in preparing her defense when the court denied her pretrial motion for permission to allow her expert to review documents in the court's file and to speak with the child's individual therapist. . . . Where the court precluded [the mother's] expert from reviewing the petitioner's documents filed with the court, or from talking with the child's therapist, it denied [the mother] a fundamentally fair proceeding by impeding her ability to have her expert effectively assess her defense, to include probing the state's case for weaknesses and identifying questions to ask the witnesses on cross-examination." (Citations omitted.) Because this claim was not preserved, the mother requests review pursuant to *Golding*. The petitioner responds that this claim is evidentiary in nature and that "the trial court properly exercised its discretion in denying [the mother's] untimely motion to release records to her private evaluator." We agree with the petitioner and, accordingly, conclude that review of the mother's unpreserved claim is inappropriate under *Golding*'s second prong. See footnote 10 of this opinion.

The following procedural history is informative. On August 4, 2020, the mother filed an ex parte motion for the release of confidential court documents to her evaluator and for permission for the evaluator to conduct an independent evaluation of the child. In her motion, she contended that the information was "necessary in order for [her] to receive a fair trial . . . ." The petitioner objected to the mother's untimely motion on several grounds, including the lateness of the motion and that an independent evaluation, at this late date, would "unnecessarily delay the proceedings . . . ." The court denied the mother's motion on August 10, 2020.

Pursuant to General Statutes § 46b-124 (b), "[a]ll records of cases of juvenile matters . . . except delinquency proceedings . . . shall be confidential and for the use of the court in juvenile matters, and open to inspection or disclosure to any third party . . . only upon order of the Superior Court . . . ." The trial court's denial of a motion to release such confidential records rests squarely within the discretion of the court. See *In re Sheldon G.*, 216 Conn. 563, 577, 584, 583 A.2d

112 (1990).

"*In re Sheldon G.* involved a delinquency proceeding, but the principles of confidentiality embodied in § 46b-124 and discussed in *In re Sheldon G.* are analogous and applicable to confidential material in termination of parental rights cases. *In re Amy H.*, 56 Conn. App. 55, 62, 742 A.2d 372 (1999). Juvenile Court records pertaining to neglect proceedings and encompassing information from [the department] are confidential and subject to disclosure to third parties only upon court order. *State* v. *Howard*, 221 Conn. 447, 459 n.10, 604 A.2d 1294 (1992); *State* v. *Whitfield*, 75 Conn. App. 201, 210–13, 815 A.2d 233, cert. denied, 263 Conn. 910, 819 A.2d 842 (2003)." (Internal quotation marks omitted.) *State* v. *William B.*, 76 Conn. App. 730, 756–57, 822 A.2d 265, cert. denied, 264 Conn. 918, 828 A.2d 618 (2003). "Procedurally, our courts have devised a method for determining whether disclosure should be made by first requiring counsel to lay a sufficient foundation." *State* v. *Whitfield*, supra, 212. "[O]nly a showing of compelling need can justify the disclosure of the confidential materials in a parental termination proceeding." *In re Amy H.*, supra, 62.

The mother attempts to avoid application of these principles to this case by trying to equate her situation to the situation presented to the Court of Appeals of Michigan in *In re Yarbrough Minors*, 314 Mich. App. 111, 885 N.W.2d 878, cert. denied, 499 Mich. 898, 876 N.W.2d 818 (2016), in which the court held that the trial court had employed an improper standard when it denied the respondents' motion for funding of an expert witness. Id., 114. Such a case is inapposite to the present situation. Here, the mother was not denied the use of an expert. Rather, her late motion for release of confidential records and for permission to conduct an independent evaluation, on the eve of trial, was denied. The mother's expert witness, in fact, did testify during the trial, and the mother was able to ask questions about the records that were in evidence. Although the mother now attempts to frame the denial of her motion as a constitutional due process claim under *Golding*, we conclude that her claim is evidentiary in nature. See *In re Sheldon G.*, supra, 216 Conn. 577, 584; *State* v. *William B.*, supra, 76 Conn. App. 756–57; *In re Amy H.*, supra, 56 Conn. App. 62; see also *In re Miyuki M.*, 202 Conn. App. 851, 860, 246 A.3d 1113 (2021) ("[t]he fact that this is a termination of parental rights case does not transform an evidentiary matter into a constitutional matter"). Accordingly, the claim fails under *Golding*'s second prong.

## II

## AC 44497

In AC 44497, the father appeals from the judgment of the trial court terminating his parental rights to, and

denying his motion for posttermination visitation with, Annessa. On appeal, the father claims that the trial court erred when it concluded that (1) the department had made reasonable efforts to reunify him with his daughter, (2) he was unlikely to be able to reunify with his daughter within a reasonable period of time or that he was unable or unwilling to rehabilitate, and (3) termination of his parental rights was in the best interest of Annessa.[13] We consider each of the father's claims in turn.

### A

The father claims that the trial court erred in concluding, pursuant to § 17a-112 (j) (1), that the department had made reasonable efforts to reunify him with Annessa. The father states specifically that he does not challenge the factual findings of the trial court but challenges only the legal conclusions of the court. We conclude that this claim is moot.

The following additional facts and procedural history are relevant to this claim. In its memorandum of decision, the court found that the department had made reasonable efforts to locate the father and to reunify him with his daughter. The court further found that the father is "unable or unwilling *to benefit from reunification efforts* . . . [and] that it is no longer appropriate for the department to make further efforts to reunify the father with [Annessa]." (Emphasis added.) On appeal, the father claims that the court improperly concluded that the department had made reasonable efforts to reunify him with his daughter. The father does not claim, however, that the court's conclusion that he was "unable or unwilling *to benefit from reunification efforts*" was improper.[14] (Emphasis added.) Because the father fails to challenge a separate independent basis for upholding the court's decision, we conclude that this claim is moot.

"Mootness raises the issue of a court's subject matter jurisdiction and is therefore appropriately considered even when not raised by one of the parties. . . . Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [a] court's subject matter jurisdiction. . . . [I]t is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the [petitioner] or [the respondent] in any way." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 555–56, 979 A.2d 469 (2009).

"[Section] 17a-112 (j) (1) requires a trial court to find by clear and convincing evidence that the department made reasonable efforts to reunify a parent and child

*unless* it finds instead that the parent is unable or unwilling to benefit from such efforts. In other words, *either finding*, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1)." (Emphasis in original; internal quotation marks omitted.) *In re Angela V.*, 204 Conn. App. 746, 753,     A.3d     , cert. denied, 337 Conn. 907, 252 A.3d 365 (2021).

In *In re Angela V.*, this court explained that "in [*In re*] *Jorden R.*, our Supreme Court, sua sponte, vacated the judgment of this court after concluding that this court had lacked jurisdiction to review the merits of the respondent's appellate claim that the trial court had erred in concluding that she was unable or unwilling to benefit from reunification efforts. . . . Our Supreme Court determined that the respondent's claim was moot because she had failed to challenge on appeal a second alternative basis of the trial court's decision. . . . [T]he [trial] court found that the department had made reasonable efforts to reunify the respondent and [the child] *and* that the respondent was unwilling and unable to benefit from reunification services. . . . In light of the trial court's finding that the department had made reasonable efforts to reunify the respondent with [the child] and the respondent's failure to challenge that finding, the [decision of this court], which disturbed only the trial court's finding that reunification efforts were not required, [could not] benefit the respondent meaningfully [because there remained an undisturbed independent basis that supported the trial court's decision]. . . . Accordingly, our Supreme Court concluded that the respondent's claim was moot because the Appellate Court could not have afforded her practical relief." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 752–53.

In the present case, the father does not claim that the court erred in concluding that he was "unable or unwilling *to benefit from reunification efforts*." (Emphasis added.) Because the father fails to challenge a separate independent basis for upholding the court's decision, we conclude that this claim is moot.

B

The father next claims that that there was insufficient evidence for the trial court to conclude that he could not rehabilitate within a reasonable period of time given Annessa's needs.[15] We disagree.

"Although the trial court's subordinate factual findings are reviewable only for clear error, the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. . . . That conclusion is drawn from both the court's factual findings and its weighing of the facts in considering whether the statutory ground has been satisfied. . . . On review, we must determine whether the trial court could have reasonably con-

cluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . To the extent we are required to construe the terms of § 17a-112 (j) (3) . . . or its applicability to the facts of this case, however, our review is plenary." (Citations omitted; internal quotation marks omitted.) *In re Egypt E.*, 327 Conn. 506, 525–26, 175 A.3d 21, cert. denied sub nom. *Morsy E.* v. *Commissioner, Dept. of Children & Families*, U.S. , 139 S. Ct. 88, 202 L. Ed. 2d 27 (2018).

One of the factors for termination for the court to consider is set forth in § 17a-112 (j) (3) (B) (i), which provides that the court may grant a petition for termination of parental rights if it finds by clear and convincing evidence that "the child . . . has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

In this case, the court found that the father had "failed to achieve such a degree of rehabilitation as to encourage the belief that, within a reasonable period of time, [he] could assume a role as a safe and responsible parent for this child." The court cited the following evidence in support of its conclusion: the father's compliance with several of his specific steps was belated, he failed to have stable housing until very recently, he has gained only some insight into his sexual abuse of his daughter and how to control his urges, and he has "a long way to go" regarding the sexual abuse. The record demonstrates that, although the neglect petition in this matter was filed on January 18, 2018, and the petition for termination of parental rights was filed on November 15, 2019, the father did not begin to engage in therapy to address his inappropriate sexual behavior until December, 2019. The father argues that he knows he has not fully rehabilitated at this time, but, nonetheless, if given more time, perhaps six months, he could further resolve the issues related to his inappropriate sexual behavior and gain more understanding of its effect on Annessa. We are not persuaded.

Although we acknowledge, as did the trial court, that the father has made progress, that progress was a long time in the making. The father was reluctant to cooperate with the department, and he initially lied to the department about whether he was getting therapy for

his sexual behavior. After the petitioner filed the neglect petition, it took more than two years for the father to begin addressing this very serious problem, which he readily admits is still a problem. Accordingly, we conclude that the evidence in the record supports the court's conclusion that the father failed to achieve the required degree of rehabilitation that would encourage the belief that, *within a reasonable period of time*, he could assume a role as a safe and responsible parent for his child.

C

The father next claims that the trial court erred in concluding that termination of his parental rights was in the best interest of Annessa. The father contends that he has a strong bond with Annessa and that his visits with her have been positive. In his appellate brief, the father has not examined each of the seven statutory factors delineated in § 17a-112 (k). Rather, his argument is that "there was absolutely no evidence adduced suggesting that continuing contact with her father while she remains in her relative foster placement was having any negative effect on her . . . [or that] the continuation of the father's legal rights would affect Annessa's well-being in any way." We are not persuaded.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven statutory factors delineated in [§ 17a-112 (k)]. . . . There is no requirement that each factor be proven by clear and convincing evidence. . . .

"On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . .

"[T]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference." (Citation omitted; internal quotation marks omitted.) *In re Omar I.*, 197 Conn. App. 499, 583–84, 231 A.3d 1196, cert. denied, 335 Conn. 924, 233 A.3d 1091, cert. denied sub nom. *Ammar I.* v. *Connecticut,* U.S. , 141 S. Ct. 956, 208 L. Ed. 2d 494 (2020).

In the present case, the court considered each of the seven statutory factors delineated in § 17a-112 (k), and it concluded that termination of the father's parental rights was in Annessa's best interest. The court stated that it had considered the bond between the father and Annessa and the fact that Annessa had voiced an interest in remaining in contact with him. The court found, however, that the father had failed to address "the problem sexual behavior that was a significant factor in the removal of Annessa," and that he had failed to make "sufficient efforts to adjust his circumstances, conduct and conditions" such that he could "assume the role of the caregiver . . . ." Furthermore, the court stated that, "[i]n addition to considering the evidence presented in [the] case, [it had] also considered the totality of the circumstances surrounding [Annessa], including [her] interest in sustained growth, development, well-being, stability, continuity of her environment, length of stay in foster care, the nature of [her] relationship with the foster and biological parents and the degree of contact maintained with the biological parents." Finally, in reaching its conclusion that termination of the father's parental rights was in Annessa's best interest, the court stated that it also had "balanced [her] intrinsic need for stability and permanency against the benefits of maintaining a connection with the father."

The record reveals that, although Annessa wanted to remain in contact with the father, she also stated that she wanted to continue to remain in the care of her foster mother, the person with whom she had a strong bond and with whom she had been living for more than two years. We conclude that there is evidence in the record to support the court's conclusion and that it is legally sound.

### III

### POSTTERMINATION MOTIONS FOR VISITATION IN AC 44405 AND AC 44497

In AC 44405 and AC 44497, the mother and the father, respectively, claim that the trial court applied the incorrect legal standard when it considered their posttermination motions for visitation with Annessa. The mother argues that "the trial court mistakenly believed that it could not consider the child's 'best interests' when

deciding her motion for posttermination visitation brought pursuant to . . . § 46b-121 (b) (1). . . . Where the trial court erred . . . was in its belief that the standard involved a finding more exacting than whether the visitation was in the child's best interests— in the trial court's words, that the visitation was 'not required for [the child's] well-being.' " Similarly, the father argues in relevant part that "[i]n ruling on [his] motion for posttermination visitation, the trial court held that [although] he and Annessa did have a good visiting relationship, '[p]osttermination visitation by [the] father with Annessa is not required for her well-being, welfare, protection, proper care or suitable support. . . .' The distinction between 'necessary or appropriate' and 'required' is crucial. . . . In articulating the standard as 'required,' the trial court elided the second part of the statutory definition of its powers: 'appropriate.' This was error." (Citations omitted; emphasis omitted.) We are persuaded by the respondents' arguments in each appeal.

The following additional facts and procedural history are relevant to our consideration of the claims. Both the mother and the father filed a motion for posttermination visitation with Annessa. In its October 23, 2020 memorandum of decision, the court ruled in relevant part that "neither the mother nor the father have met their burden to prove posttermination visitation for such parent *is necessary or appropriate* to secure the welfare, protection, proper care and suitable support of [Annessa]. The mother avers that it is in the best interest of Annessa for visitation to continue. That is not the standard under . . . § 46b-121 (b) (1). . . . Posttermination visitation by the mother with Annessa *is not required* for her well-being, welfare, protection, proper care or suitable support. The mother's motion is denied. . . . [T]he father likewise avers it is in the best interest of Annessa for visitation to continue. The father and Annessa do have a good visiting relationship. However, that does not equate to a finding that posttermination contact *is required* for Annessa. . . . Posttermination visitation by the father with Annessa *is not required* for her well-being, welfare, protection, proper care or suitable support. The father's motion is denied." (Emphasis added.) The mother and the father now claim that the court employed an improper standard because it specifically required them to prove that posttermination visitation *was necessary* to ensure Annessa's "well-being, welfare, protection, proper care or suitable support," which is not the standard set forth by our Supreme Court in *In re Ava W.*, supra, 336 Conn. 588–90. We agree.

"The question of whether a trial court has held a party to a less exacting [or more exacting] standard of proof than the law requires is a legal one. . . . Accordingly, our review is plenary. . . . *Kaczynski* v. *Kaczynski*, 294 Conn. 121, 126, 981 A.2d 1068 (2009). Similarly,

plenary review applies to a question of misallocation of a burden of proof. See *New Haven* v. *State Board of Education*, 228 Conn. 699, 714–20, 638 A.2d 589 (1994) (applying plenary review to challenge to allocation of burden of proof between parties in administrative appeal); *Zabaneh* v. *Dan Beard Associates, LLC*, 105 Conn. App. 134, 140, 937 A.2d 706 (applying plenary review to plaintiff's claim that the [trial] court improperly required that it, rather than the defendant, bear the burden of proof regarding the existence of permission), cert. denied, 286 Conn. 916, 945 A.2d 979 (2008); *Wieselman* v. *Hoeniger*, 103 Conn. App. 591, 596–97, 930 A.2d 768 (applying plenary review to claim that although the court applied the clear and convincing standard of proof required to establish a fraudulent transfer, it did so to the wrong party), cert. denied, 284 Conn. 930, 934 A.2d 245 (2007). *Braffman* v. *Bank of America Corp.*, 297 Conn. 501, 516, 998 A.2d 1169 (2010). Furthermore, if it is not otherwise clear from the record that an improper standard was applied, the appellant's claim will fail on the basis of inadequate support in the record. *Kaczynski* v. *Kaczynski*, supra, 131." (Internal quotation marks omitted.) *In re Jason R.*, 306 Conn. 438, 452–53, 51 A.3d 334 (2012).

The recent decision of our Supreme Court in *In re Ava W.*, supra, 336 Conn. 545, informs and controls our review of these claims. In *In re Ava W.*, our Supreme Court discussed the trial court's authority to order posttermination visitation in a termination of parental rights case. Id., 585–86, 588–89. The court expressly held that, pursuant to § 46b-121 (b) (1),[16] the trial court has the broad authority to order posttermination visitation "within the context of a termination proceeding . . . [if it determines that] such visitation [is] necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child." Id., 548–49. The court explained that it "was setting forth, for the first time, the standard and potential considerations for [the trial court] to consider when evaluating whether posttermination visitation should be ordered within the context of a termination proceeding." Id., 588.

The petitioner in the present case contends that the trial court correctly stated that our Supreme Court explicitly rejected the best interest standard in *In re Ava W.* We disagree. Our reading of *In re Ava W.* leads us to conclude that our Supreme Court, instead, held that, when considering a motion for posttermination visitation during a termination of parental rights case, the trial court's consideration of the traditional best interest of the child is only part of the consideration of whether such visitation is "necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child." (Internal quotation marks omitted.) Id., 589. Our conclusion is supported by the court's explanation that, "[w]hether to order posttermination visitation is, of course, a question of fact for the

trial court, which has the parties before it and is in the best position to analyze all of the factors which go into the ultimate conclusion that [*posttermination visitation is in the best interest of the child*]. . . . Our dedicated trial court judges, who adjudicate juvenile matters on a daily basis and must make decisions that concern children's welfare, protection, care and support, are best equipped to determine the factors worthy of consideration in making this finding. As examples—which are neither exclusive nor all-inclusive—a trial court may want to consider the child's wishes, the birth parent's expressed interest, the frequency and quality of visitation between the child and birth parent prior to the termination of the parent's parental rights, the strength of the emotional bond between the child and the birth parent, any interference with present custodial arrangements, and any impact on the adoption prospects for the child. . . . Trial courts should, of course, evaluate those considerations independently from the termination of parental rights considerations." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 589–90. Thus, in deciding whether to grant a parent's motion for posttermination visitation a court should consider the best interest of the child, but it should not limit its inquiry to the same analysis of best interest made during the dispositional phase of the termination of parental rights hearing. Instead, the court should take a broader view of best interest, including consideration of the factors set forth in *In re Ava W.*, to determine whether posttermination visitation is "necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child." Id., 589.

The mother claims that the court expressly rejected any reliance on the best interest of Annessa in ruling on her motion for posttermination visitation. In addition, the mother and the father claim that the court in the present case improperly required each of them to establish that posttermination visitation *was required* for Annessa's well-being. On the basis of the clear language employed by the court in this case, we agree. Although the court cited to § 46b-121 (b) (1) and stated in relevant part that the mother and the father had not met their burden to prove that posttermination visitation was "necessary or appropriate to secure the welfare, protection, proper care and suitable support of the child," the court went on to explain that the best interest standard was "not the standard under . . . § 46b-121 (b) (1)" and that posttermination visitation was "*not required* for the child's well-being, welfare, protection, proper care or suitable support." (Emphasis added.)

On the basis of these statements by the court, we are persuaded that the court failed to consider the appropriate standard under § 46b-121 (b) (1) and *In re Ava W.*, namely, whether posttermination visitation is "*necessary or appropriate* to secure the welfare, pro-

tection, proper care and suitable support of [the] child'' taking into account the traditional best interest analysis and the type of additional factors identified in *In re Ava W. In re Ava W.*, supra, 336 Conn. 589.

The orders of the trial court denying the motions for posttermination visitation by the mother and the father are reversed and the case is remanded for further proceedings on the respondents' motions; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** August 3, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Due to the COVID-19 pandemic, the Judicial Branch began holding remote hearings using the Microsoft Teams platform. For more information, see State of Connecticut, Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 13, 2020), available at https://jud.ct.gov/HomePDFs/ConnecticutGuideRemoteHearings.pdf (last visited July 29, 2021) ("Microsoft Teams is a collaborative meeting app with video, audio, and screen sharing features").

[2] The father successfully completed his probation on May 3, 2020.

[3] "Due to the COVID-19 . . . pandemic, the trial was conducted virtually. The court made every reasonable effort to allow counsel and the parties to confer with each other during the proceedings and to address technical issues that arose from time to time. Using the virtual technology, the court was able to assess the demeanor and credibility of the witnesses."

[4] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[5] In both Docket Nos. AC 44405 and AC 44497, the attorney for Annessa has adopted the brief of the petitioner.

[6] General Statutes § 46b-121 (b) (1) provides in relevant part: "In juvenile matters, the Superior Court shall have authority to make and enforce such orders directed to parents, including any person who acknowledges before the court paternity of a child born out of wedlock, guardians, custodians or other adult persons owing some legal duty to a child therein, as the court deems necessary or appropriate to secure the welfare, protection, proper care and suitable support of a child subject to the court's jurisdiction or

otherwise committed to or in the custody of the Commissioner of Children and Families. . . . In addition, with respect to proceedings concerning delinquent children, the Superior Court shall have authority to make and enforce such orders as the court deems necessary or appropriate to provide individualized supervision, care, accountability and treatment to such child in a manner consistent with public safety, deter the child from the commission of further delinquent acts, ensure that the child is responsive to the court process, ensure that the safety of any other person will not be endangered and provide restitution to any victim. The Superior Court shall also have authority to grant and enforce temporary and permanent injunctive relief in all proceedings concerning juvenile matters."

[7] "To be clear, our holding and analysis in the present case are limited to the procedural posture by which the respondent sought posttermination visitation. Specifically, she requested posttermination visitation during a proceeding in which she was the respondent and the petitioner sought to terminate her parental rights. At that time, the trial court had the appropriate parties and evidence before it to consider her request as 'necessary or appropriate to secure the welfare, protection, proper care and suitable support of [the] child . . . .' General Statutes § 46b-121 (b) (1). We do not opine upon whether a trial court has authority to consider a request for posttermination visitation made after parental rights have been terminated. In that kind of case, we might be required to examine a variety of constitutional rights and statutory authority not implicated in the present case, namely, but not exclusively, whether the parent whose rights have been terminated has the right to pursue posttermination visitation and whether the trial court's authority to grant posttermination visitation has been abrogated by the visitation statute. See General Statutes § 46b-59 (b); see also *In re Andrew C.*, Docket No. H-12-CP11013647-A, 2011 WL 1886493, *11 (Conn. Super. April 19, 2011) (explaining that permitting parents whose rights have been terminated to file applications for visitation pursuant to § 46b-59 'could significantly impede what the law requires be an expeditious progress toward achieving permanency for a child')." (Emphasis omitted.) *In re Ava W.*, supra, 336 Conn. 590 n.18.

[8] The mother also claims that the court employed an improper legal standard when it considered her motion for posttermination visitation. We will consider this claim in part III of this opinion.

[9] Article fifth, § 1, of the Connecticut constitution, as amended by article twenty, § 1, provides: "The judicial power of the state shall be vested in a supreme court, an appellate court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[10] "Pursuant to the *Golding* doctrine, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the [respondent's] claim will fail. . . . The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim. . . . The appellate tribunal is free, therefore, to respond to the [respondent's] claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Turner*, 181 Conn. App. 535, 549–50, 187 A.3d 454 (2018), aff'd, 334 Conn. 660, 224 A.3d 129 (2020). In *In re Yasiel R.*, supra, 317 Conn. 781, our Supreme Court modified the third prong of *Golding* by eliminating the word "clearly" before the words "exists" and "deprived."

[11] The mother does not allege a violation of her right to due process of law under the fourteenth amendment to the United States constitution with regard to this claim.

[12] Accepting the mother's argument essentially would mean that a sight impaired judge could not constitutionally preside over *any* bench trial because his or her inability to see the witnesses would violate the litigants' rights under the Connecticut constitution. Although we have been unable

to locate any cases in Connecticut in which such an argument has been made, courts in other states have repeatedly rejected similar claims. See *People* v. *Hayes*, 923 P.2d 221, 225–26 (Colo. App. 1995) (hearing before blind judge does not deny due process); *Galloway* v. *Superior Court*, 816 F. Supp. 12, 17 (D.D.C. 1993) ("[I]n the United States, there are several active judges who are blind. Indeed, it is highly persuasive that . . . a blind person . . . served as a judge on the Superior Court of the District of Columbia and presided over numerous trials where he was the sole trier of fact and had to assess the credibility of the witnesses before him and evaluate the documentation and physical evidence."). Similarly, there is no question that a sight impaired individual may serve as a juror in Connecticut. See, e.g., *State* v. *Mejia*, 233 Conn. 215, 227–28, 658 A.2d 571 (1995).

[13] The father also claims that the court employed an improper legal standard when it considered his motion for posttermination visitation. We will consider this claim in part III of this opinion.

[14] Although the father challenges the court's finding under § 17a-112 (j) (3) (B) that he "has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [he] could assume a responsible position in the life of the child," he has not challenged the court's finding under § 17a-112 (j) (1) that he is unwilling or unable to benefit from reunification efforts.

[15] In footnote 4 of the father's appellate brief, he argues that "he was not fully rehabilitated at the time of trial, but . . . the evidence suggested he would likely rehabilitate within a reasonably foreseeable period. As such, the arguments concerning the trial court's ruling that he failed to rehabilitate and its ruling that he was unwilling or unable to do so are the same."

[16] See footnote 6 of this opinion.